UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                 )
UNITED STATES OF AMERICA,        )
                                 )
        v.                       )   CR. No. 11-124 S
                                 )
JASON MITCHNER,                  )
                                 )
            Defendant.           )
_____)
```

### OPINION AND ORDER

WILLIAM E. SMITH, United States District Judge.

Defendant Jason Mitchner is charged with: (1) being a felon in possession of firearms and ammunition, see 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (2) possession of cocaine with intent to distribute within 1,000 feet of a school, see 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 860(a). (Indictment, ECF No. 1.) Now before the Court is Mitchner's Motion to Suppress Evidence and Statements ("Motion to Suppress") (ECF No. 42). For the reasons set forth below, that motion is DENIED.

I.  Facts

On September 19, 2013, the Court held a hearing on the instant motion. The first witness called to testify, and the only one possessing firsthand knowledge of the investigation leading to Mitchner's arrest and the search of his residence,

was Detective Martin Hames.[1]   Detective Hames testified that he has worked for the Providence Police Department ("PPD") for approximately twelve years, and has worked in the area of narcotics and organized crime for more than eight years.   During this time, Detective Hames has investigated hundreds of narcotics cases and at least seventy-five cases involving guns.

Detective Hames's involvement in the instant case began in early March 2011, when he and his partner, Detective John Bento, received information from a confidential informant ("CI") that a man named "Jay" was selling cocaine out of a house on Gallatin

---

[1] Having had the opportunity to observe Detective Hames at the hearing, this Court credits his testimony.   Defense counsel attempted to impeach Hames by pointing out certain omissions from his search warrant affidavit, incident report, and witness statement.   However, none of the omitted information was crucial to the two main issues in dispute:   (1) whether there was probable cause to support the search warrant for 108 Gallatin Street and (2) whether the Providence Police Department's detention of Mitchner at the gas station constituted an arrest without probable cause.   See United States v. Jones, 187 F.3d 210, 215 (1st Cir. 1999) (affirming the district court's favorable credibility determination where "the points upon which the troopers' testimony differed . . . generally were collateral facts not central to establishing whether the troopers had a reasonable suspicion that justified stopping the [vehicle], whether they had probable cause to arrest [the suspect], or whether they violated his Fourth or Fifth Amendment rights in the process").

Similarly, the factual discrepancies between the government's memorandum and Detective Hames's testimony regarding Mitchner's initial detention, while troubling, do not warrant discrediting Hames.   The Court accepts the Assistant United States Attorney's explanation that, in drafting the memorandum, he drew certain unsupported "inferences" from what he had been told by the witness. (See Mot. to Suppress Hr'g Tr. 82, Sept. 19, 2013.)

Street in Providence, Rhode Island.  The CI described Jay as a tall, heavy set black male with dreadlocks.  The CI had a criminal history and was assisting law enforcement in hopes of obtaining favorable treatment on charges pending against him. Detective Hames also testified that the CI had provided him with reliable information in the past.

After receiving this tip, Detective Hames searched the PPD database for individuals whose names begin with "Ja" and who live on Gallatin Street.  The search identified Jason Mitchner, residing at 108 Gallatin Street.  Detective Hames confirmed this address by searching for Mitchner's name in the Department of Corrections database.  As a result of these searches, Detective Hames obtained a photograph of Mitchner, which was a close match to the physical description provided by the CI.  Later, the CI confirmed that the photograph depicted the person he knew as Jay.  Detective Hames also recognized Mitchner as someone he had attended high school with.  Additionally, Detective Hames checked Mitchner's criminal history and discovered multiple prior convictions.

Beginning the week of March 7, 2011, the PPD began conducting "sporadic surveillance" of 108 Gallatin Street to confirm that Mitchner was still living there.  (Mot. to Suppress Hr'g Tr. 8, Sept. 19, 2013.)  During this surveillance,

Detective Hames observed Mitchner enter and exit the side door of the house.

Later that same week, detectives decided to arrange a controlled buy. Detectives Hames and Bento met the CI at a prearranged location. They searched the CI and his vehicle to ensure that he did not have any contraband. They also gave the CI money to complete the controlled buy. After the meeting, detectives followed the CI to 108 Gallatin Street. Upon arriving at that address, the CI waited in his vehicle for a few minutes until Mitchner pulled into the driveway. Mitchner and the CI exited their cars, had a brief conversation, and entered 108 Gallatin Street. The CI emerged a few minutes later. Detectives followed the CI back to the prearranged location, where he handed Detective Hames a substance that later tested positive for the presence of cocaine. The CI said he purchased the substance from Jay.

Finally, Detective Hames prepared a search warrant application for 108 Gallatin Street. His affidavit in support of the warrant relates, with little detail, the CI's tip that "Jay" was distributing cocaine from 108 Gallatin Street. It does not disclose the CI's criminal history or his history of providing reliable information. Next, the affidavit describes detectives' identification of "Jay" as Mitchner and the CI's subsequent confirmation of that identification. It also states

4

that the Department of Corrections database listed Mitchner's address as 108 Gallatin Street, and that Mitchner was observed at that address during subsequent surveillance. Finally, and most significantly, Detective Hames's affidavit relates the circumstances of the controlled buy. The affidavit does not, however, indicate that Mitchner arrived at 108 Gallatin Street and interacted with the CI prior to the controlled buy. At the hearing on Defendant's motion, Hames freely admitted that the affidavit does not contain every detail of the investigation.

On March 11, 2011, the state judge issued a warrant to search 108 Gallatin Street as well as Mitchner's person for "[n]arcotics, firearms, monies and goods derived from the illegal sales of narcotics, as well as Paperwork [sic] showing bills and records as to the occupant of said dwelling, where proceeds of narcotics sales may be stored."[2] (Gov't's Ex. 1.)

Detectives set out to execute the warrant on March 16, 2011. They followed Mitchner to an industrial park in Cranston, Rhode Island and then back to Providence, where Mitchner pulled into a gas station. Detectives Hames and Bento pulled their car behind Mitchner's. Detective Hames exited his vehicle and approached Mitchner, with at least two other officers present.

_____

[2] While Mitchner contends that the affidavit did not create probable cause to believe that evidence of a crime would be found at 108 Gallatin Street, he does not raise any argument regarding the scope of the warrant.

Detective Hames identified himself, showed his badge, and asked Mitchner if he remembered him from school.  Detective Hames then told Mitchner that the PPD had a search warrant for his residence and asked if there was anything in the house they should know about.  Mitchner responded, "there might be a couple of guns."  (Mot. to Suppress Hr'g Tr. 17.)  During his interactions with detectives, Mitchner was "calm, relaxed, cooperative, [and] very respectful."  (Id.)  At this point, detectives patted Mitchner down, handcuffed him, and placed him in the back of their vehicle.  The government concedes that this constituted a de facto arrest.  Once he was in the car, Mitchner asked Detective Hames not to break the door to the house down and offered to let detectives use his keys.

Detectives transported Mitchner to 108 Gallatin Street to execute the warrant.  Mitchner's demeanor continued to be "calm," "respectful," and "relaxed."  (Id. at 22.)  Detectives Hames and Bento walked Mitchner into the kitchen, while the rest of the detectives searched the house.  Within a few minutes, they found a gun.  At this point, Detective Hames advised Mitchner of his Miranda rights and asked him if there was anything else in the house.  Again, Mitchner indicated that "there might be a couple of guns."  (Id. at 21.)  The search proceeded, and, ultimately, detectives recovered three firearms,

ammunition, narcotics, and bagging material, among other things. (See Gov't's Ex. 1.)

Upon completion of the search, Mitchner was again relocated, this time to one of the interrogation rooms in the PPD station, where he was interviewed by Agent Wing Chau of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

II.  Discussion

Mitchner seeks to suppress all evidence seized by and statements given to law enforcement as a result of the search and arrest that occurred on March 16, 2011.  He raises three arguments in support of his motion:  (1) there was no probable cause to support the search warrant; (2) the detention of Mitchner at the gas station constituted an arrest without probable cause; and (3) Mitchner's statements to law enforcement were involuntary and must be suppressed as fruit of the poisonous tree.  Each of these arguments will be addressed in turn.

A.  Probable Cause

Probable cause exists to support a search warrant where, "given all the circumstances set forth in the affidavit," "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  Probable cause is not akin to a preponderance of the evidence standard.  See Texas v. Brown, 460

7

U.S. 730, 742 (1983).  In reviewing a magistrate's determination on this point, the Court must "ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed."  Gates, 462 U.S. at 238-39 (internal citation and quotation marks omitted) (alteration in original).

Where information obtained from an informant serves as the basis for a probable cause determination, the First Circuit has identified a non-exhaustive list of factors for courts to consider:

> (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect firsthand knowledge; (3) whether some or all [of] the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information. Because [n]one of these factors is indispensable,□ a stronger showing of supporting evidence as to one or more factors may effectively counterbalance a lesser showing as to others.

United States v. Trinh, 665 F.3d 1, 10 (1st Cir. 2011) (internal citations and quotation marks omitted) (alterations in original).  The First Circuit has also made clear that "[t]he risk that the informant is lying or in error need not be wholly eliminated.  Rather, what is needed is that the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations." □  United States v.

<u>Khounsavanh</u>, 113 F.3d 279, 284 (1st Cir. 1997) (internal citation and quotation marks omitted).

In the instant case, the affidavit presented to the state judge admittedly provided no information about the CI's past reliability or basis of knowledge.  However, detectives corroborated this tip by arranging a controlled buy at 108 Gallatin Street.  The First Circuit has, in similar circumstances, found probable cause to support a search warrant. <u>See</u> <u>United States v. Materas</u>, 483 F.3d 27, 32 (1st Cir. 2007); <u>Khounsavanh</u>, 113 F.3d at 285-86.  Contrary to Mitchner's suggestions, the fact that the police did not actually observe the exchange is not determinative.  <u>See</u> <u>Khounsavanh</u>, 113 F.3d at 286 (noting that "the detective was able to watch the informant enter and leave the building through its front door, but did not follow the informant into the building and thus was unable to verify with certainty which apartment was the source of the drugs (or even whether the drugs had been secreted elsewhere in the building, as the defendant had hypothesized)").  The <u>Khounsavanh</u> court also squarely rejected Mitchner's contention that the lack of information regarding the CI's past reliability precludes a finding of probable cause.  <u>See</u> <u>id.</u>  Here, the affidavit states that detectives observed the CI enter 108 Gallatin Street and emerge a few minutes later.  Upon meeting the detectives at a prearranged location, the CI met up with

Michner, entered the house, and returned to meet with officers, then produced cocaine which he said was purchased from Mitchner. This information is sufficient to create probable cause.

Mitchner cites two First Circuit cases for the proposition that "[a] warrant application must demonstrate probable cause to believe that (1) a crime has been committed-the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched-the so-called 'nexus' element." United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005) (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)).  He proceeds to argue that the nexus element has not been satisfied here.  However, Ribeiro and Feliz are inapposite. Both of these cases involved warrant applications predicated on controlled buys occurring somewhere other than the place to be searched.  See Ribeiro, 397 F.3d at 45; Feliz, 182 F.3d at 84. Here, by contrast, the controlled buy occurred at 108 Gallatin Street, the same location that was the subject of the search warrant.  See United States v. Rodrigue, 560 F.3d 29, 34 (1st Cir. 2009) (distinguishing Feliz on the grounds that it involved a search "justified by a suspect's connection to a place," as opposed to a direct connection between the place to be searched and the suspected criminal activity).  In these circumstances, the nexus element was clearly satisfied.  See Materas, 483 F.3d at 32 ("Common sense dictates that evidence of [the suspect's]

possession could probably be found in the location where he sold drugs two days before.").

Detective Hames's affidavit is not remotely comparable to the type of conclusory document condemned by the Supreme Court in Nathanson v. United States, 290 U.S. 41 (1933).   There, the Court held insufficient an agent's statement that "he has cause to suspect and does believe" that certain contraband was at the premises to be searched.   Id. at 44.   In the present case, by contrast, the affidavit set out sufficient facts, namely the circumstances of the controlled buy, from which the state judge could make an independent probable cause determination.

Even assuming, for the sake of argument, that the state judge incorrectly found probable cause to search the house, Mitchner is not entitled to suppression.   This is because, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."   United States v. Leon, 468 U.S. 897, 921 (1984).   Thus, under the good faith exception to the exclusionary rule, suppression of the fruits of a search conducted pursuant to an invalid warrant is not required so long as the officer's reliance on the warrant was "objectively reasonable."   Id. at 922.   In the present case, it cannot fairly be said that the affidavit is "so lacking in indicia of probable cause as to render official belief in its

existence entirely unreasonable." Id. at 923 (internal citation and quotation marks omitted). For this reason, suppression is inappropriate.

In addition to generally taking issue with the state judge's probable cause determination, Mitchner also presents the "further concern" that the affidavit fails to mention the CI's criminal record or his motivation for cooperating with the police. (Mot. to Suppress 13.) On this point, Mitchner cites United States v. Hall, 113 F.3d 157 (9th Cir. 1997). There, the Ninth Circuit, after a Franks hearing before the district court, held that suppression was required where an officer testifying at the search warrant hearing deliberately or recklessly withheld an informant's prior conviction for falsely reporting a crime.

As a preliminary matter, Mitchner has not requested a Franks hearing in the present case. Moreover, Hall is distinguishable in many significant respects. First, in Hall, outside of the informant's testimony, there was no evidence to support a finding of probable cause. Id. at 158. Here, by contrast, the police corroborated the information provided by the CI by arranging a controlled buy. Second, in Hall, a trooper was directly questioned under oath about the informant's criminal history. He listed many prior convictions, but failed to mention the conviction for false reporting. Id. In the

12

present case, the affiant did not give oral testimony, and did not provide an incomplete answer to a direct question regarding the CI's criminal history.   In these circumstances, the non-disclosure is far less troubling.   Third and finally, the nature of the undisclosed prior conviction in <u>Hall</u> "suggested the possibility that [the informant] would lie to the police to frame an innocent man."   <u>Id.</u> at 160.   Here, by contrast, Detective Hames testified that the CI's prior convictions were for drug offenses.   See <u>United States v. Adler</u>, 152 F.3d 929, at *3 n.1 (9th Cir. 1998) (Table) (distinguishing <u>Hall</u> on the grounds that it "concern[ed] the omission of an informant's past crimes that involved <u>dishonesty</u>").   In any event, Mitchner's argument fails because the controlled buy was sufficient to establish probable cause, notwithstanding the CI's prior convictions.   See <u>United States v. Legault</u>, 323 F. Supp. 2d 217, 227 (D. Mass. 2004) (declining to hold a <u>Franks</u> hearing because the affiant's omission of an informant's criminal background and request for leniency "do not fatally undermine the affidavit's showing of probable cause").   Indeed, the fact that the CI was cooperating with police to obtain favorable treatment on charges pending against him would have bolstered, not diminished, his credibility.   See <u>id.</u> at 226-27 (citing cases).

B.   Detention

Mitchner's next argument is predicated upon the Supreme Court's recent decision in Bailey v. United States, 133 S. Ct. 1031 (2013).   There, the Court held that detention incident to the execution of a search warrant is limited to "the immediate vicinity of the premises to be searched."   Id. at 1042.   The lawfulness of detentions outside this limited area "is controlled by other standards, including, of course, a brief stop for questioning based on reasonable suspicion under Terry or an arrest based on probable cause."   Id.

The government does not attempt to justify the detention at issue here under Bailey.   Rather, it argues that detectives' initial interactions with Mitchner constituted a permissible Terry stop.   The First Circuit has explained that "[i]nteraction between law enforcement officials and citizens generally falls within three tiers of Fourth Amendment analysis, depending on the level of police intrusion into a person's privacy":   (1) "interaction of such minimally intrusive nature that it does not trigger the protections of the Fourth Amendment"; (2) Terry stops; and (3) arrests.   United States v. Young, 105 F.3d 1, 5-6 (1st Cir. 1997).   Here, detectives' initial interactions with Mitchner appear to fall within the first tier.   Police approached Mitchner at a gas station, informed him of the outstanding search warrant, and asked him what was in the house.

14

It is far from clear that this conduct implicated the Fourth Amendment at all.  See id. at 6 ("Police may approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment.").

However, the Court need not reach this issue because, even if detectives' interactions with Mitchner constituted a seizure, it was a valid Terry stop, not a de facto arrest.  Under Terry:

> based merely on a reasonable and articulable
> suspicion, a police officer may make a brief stop or
> 'seizure' of an individual to investigate suspected
> past or present criminal activity.  Such a seizure
> will be upheld as constitutionally permissible so long
> as it was justified at its inception, and, if so, . .
> . the action taken was reasonably related in scope to
> the circumstances which justified the interference.

United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998) (internal citation and quotation marks omitted) (alteration in original).  Here, the CI's tip, corroborated by the subsequent controlled buy, clearly created reasonable suspicion sufficient to support a Terry stop.  Moreover, the detention was significantly less intrusive than an arrest.  "[A]n investigatory stop constitutes a de facto arrest when a reasonable man in the suspect's position would have understood his situation . . . to be tantamount to being under arrest." Id.  (internal citation and quotation marks omitted).  During his brief initial communications with detectives, Mitchner was not handcuffed or otherwise detained, and it would have been

15

unreasonable for him to understand his situation as a <u>de facto</u> arrest.[3]

After Mitchner told officers that there might be guns at the house, he was handcuffed and placed in the cruiser. At this point, the government concedes that an arrest occurred. However, this arrest was supported by probable cause. In light of Detective Hames's knowledge of Mitchner's criminal record, Mitchner's statement created probable cause to arrest him as a felon in possession of a firearm. Separately, the CI's tip and controlled buy created probable cause to arrest Mitchner on drug charges. In this context, it is important to note that certain details omitted from the search warrant affidavit but known to the officers, most notably the CI's past reliability and the fact that Mitchner had arrived at 108 Gallatin Street and interacted with the CI immediately prior to the controlled buy, further support a finding of probable cause to arrest. <u>See</u> <u>United States v. Perez</u>, No. CR. 09-029 S, 2009 WL 3398488, at *5 (D.R.I. Oct. 20, 2009) ("The information given by the CI, who had successfully worked with the ATF in the past, combined with

---

[3] While Mitchner does not raise any <u>Miranda</u> argument, it is worth noting that he was not in custody when he made his first incriminating statement to police. <u>See</u> <u>Jones</u>, 187 F.3d at 217-18 ("The decisive issue in the custody inquiry is 'whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994)). Mitchner's subsequent statements to law enforcement were preceded by <u>Miranda</u> warnings.

the information obtained from the controlled buy, furnished
probable cause to believe that [the suspect] was trafficking in
narcotics.").

The fact that Detective Hames appears to have subjectively
believed he was detaining Mitchner in order to facilitate the
search of 108 Gallatin Street is not determinative.  As Judge
Tauro of the District of Massachusetts recently pointed out in a
similar context, "[t]he Supreme Court has emphasized that the
probable cause inquiry is objective."  United States v. Dixon,
CRIM.A. 11-10218-JLT, 2013 WL 1821613, at *3 (D. Mass. Apr. 29,
2013) (citing Devenpeck v. Alford, 543 U.S. 146 (2004)).
Indeed, "[t]he fact that the officer does not have the state of
mind which is hypothecated by the reasons which provide the
legal justification for the officer's action does not invalidate
the action taken as long as the circumstances, viewed
objectively, justify that action."  Id. (quoting Devenpeck, 543
U.S. at 153).  Judge Tauro rejected an argument based on Bailey,
identical to the one raised here.  He explained, "This court
need not consider whether Defendant's detention was justified as
incident to execution of a search warrant because the officers
had probable cause to arrest Defendant."  Id. at *4.  This
analysis applies in the present case as well.

C.   Mitchner's Statements

Mitchner raises two arguments regarding his statements to law enforcement.   First, he claims that those statements must be suppressed because they were involuntary.   "When charged with determining whether a confession was voluntary, an inquiring court must sift through the totality of the circumstances, including both the nature of the police activity and the defendant's situation."   United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011).   Relevant considerations include "the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect," as well as "an appraisal of the defendant's attributes, such as his age, education, intelligence, and mental state."   Id.

In the present case, Mitchner challenges the voluntariness of his first two statements to law enforcement, made at the gas station and at 108 Gallatin Street, respectively.   At the hearing, he expressly waived any argument regarding the voluntariness of the statements he made to Agent Chau at the police station.   (See Mot. to Suppress Hr'g Tr. 1-2.)   With respect to the two statements at issue, the facts elicited by the government are more than sufficient to establish voluntariness.   Detectives' interactions with Mitchner at the gas station were brief and cordial.   Mitchner's statements at

18

108 Gallatin Street occurred in a more formal environment. Mitchner was handcuffed at the kitchen table.  However, Mitchner fails to allege that he was subject to any promises, threats, or deprivations.  According to the government, he was calm and relaxed during all his interactions with the police.  Finally, he was advised of his constitutional rights before being questioned.

Next, Mitchner contends that his statements must be suppressed because they were obtained as a direct result of the illegal arrest and search.  This argument fails because, as discussed above, both the search and the arrest complied with the Fourth Amendment.

III. Conclusion

For the foregoing reasons, Defendant's Motion to Suppress is DENIED.


IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date: November 5, 2013